IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA EMERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14 C 5898 |
| | ) | |
| THOMAS J. DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Paula Emerson ("Emerson") filed this lawsuit under Title VII and 42 U.S.C. § 1983[1] against Cook County, Cook County Sheriff Thomas Dart and Cook County Department of Corrections Officers Lieutenant David Grochowski ("Grochowski") and Sergeant William Zurella ("Zurella") (collectively "County Defendants"), charging that she was subjected to retaliation for having filed numerous complaints about her treatment at work, in violation of Section 2000e-3 and the First Amendment to the United States Constitution. County Defendants have moved for summary judgment on all of Emerson's claims. For the reasons stated in this opinion, their motion is granted and Emerson's action is dismissed.

**Factual Background**

Between 2008 and September 17, 2012 Emerson worked on the 7 a.m. to 3 p.m. shift in Cook County Department of Corrections Division 9, a living unit that houses maximum security

---

[1] All further references to sections of Title 42 of the United States Code will take the form "Section --," omitting the prefatory "42 U.S.C. §".

inmates (C. St. ¶ 2).² Thereafter Emerson was on paid medical leave from September 2012 until March 2014, and she has been on unpaid medical leave since then (E. Resp. St. ¶ 3).

Grochowski has been employed by the Sheriff's Department since 1978 and assigned to Division 9 for an unspecified length of time, and Zurella has been assigned to Division 9 since 2011 (C. St. ¶¶ 4, 5). Inmates in Division 9 live in "tiers," and there are a total of 24 tiers in the division, including the "Level System" that comprises two of the tiers and houses inmates with behavioral problems (id. ¶¶ 8, 9). At all times there must be a correctional officer assigned to each tier and 3 or 4 officers assigned to the Level System (id. ¶ 10). Officers assigned to Division generally have some level of interaction or contact with the inmates (id. ¶ 7).

Correctional officers rotate through 90-day assignments, with their rotations recorded and reported on the Daily Roster Sheet (C. St. ¶ 12). Those assigned to a tier sit in the interlock area, which is a room outside the tier, and their general duties include overseeing the shift and ensuring that inmates receive time outside of their cells (id. ¶ 13). Correctional officers who are assigned to sanitation move throughout Division 9 to clean and to remove garbage, and those assigned to "powerwash" clean inmates' cells, shower areas and common bathrooms (id. ¶ 14). Assignments such as powerwash and sanitation are considered nonessential, but tier assignments must be staffed at all times by at least one, and preferably two, officers (id. ¶¶ 35, 36). Occasionally officers who are on sanitation or powerwash are temporarily assigned to a tier if there is a staffing shortage (id. ¶¶ 16, 35, 36). At one point Emerson informed her union that being assigned to sanitation and powerwash helps her to manage her stress and anxiety (id. ¶ 33).

---

² Citations to County Defendants' Statement of Material Facts will take the form "C. St. ¶ --," with Emerson's response cited "E. Resp. St. ¶ --." Emerson's Affidavit, which states additional facts, will take the form "E. Aff."

Before filing this action Emerson filed two complaints and a series of internal incident report memos ("To/Froms") about her treatment in the workplace. First she filed a charge in 2009 with the Illinois Department of Human Rights ("2009 charge") of race- and gender-based harassment and discrimination by Lieutenant Young and Officer Heilemann ("Heilemann"), neither of whom is named in this lawsuit. That charge was dismissed in 2011 (C. St. ¶¶ 19, 20). Emerson never discussed the 2009 charge with Grochowski or Zurella (id. ¶ 22). Then in 2012 Emerson filed a complaint with the Sheriff's Office of Professional Review ("OPR") against Grochowski about her assignments and her periodic placement near Heilemann, but the complaint included no allegations of discrimination (E. Resp. St. ¶ 23). Furthermore, during the course of her employment Emerson submitted multiple incident To/From communications complaining about assignments and interactions with her supervisors (E. Mem. 7-8; E. Dep. Ex. B). None of the To/Froms produced by Emerson in this lawsuit mention discrimination, nor does Emerson claim that they do so (see E. Dep. Ex. B).[3]

Emerson asserts in this case that Grochowski and Zurella retaliated against her for filing complaints against them and others at the Department. To support her retaliation claim Emerson refers to a number of matters:

1. At times Grochowski changed her assignment from powerwash or sanitation to a tier. As to one such occasion Emerson admitted that it was "not unusual" (E. Mem. 2; C. St. ¶ 38; E. Resp. St. ¶ 38).

2. Grochowski gave non-African-American officers (Emerson is African-American) assignments for which Emerson had requested (and had been denied) training and assignment (E. Mem. 5; E. Resp. St. ¶ 37; E. Aff. ¶ 3).

---

[3] Citations to County Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment will take the form "C. Mem. --," while Emerson's Memorandum in Response will be cited as "E. Mem. --." Emerson's Deposition will be cited as "E. Dep."

     3.       Grochowski ignored Emerson during roll call (E. Mem. 2).

     4.       Grochowski has assigned Emerson near Heilemann, who had been one of the subjects of her 2009 charge (id.).

     5.       Grochowski also said to an officer whom he saw talking to Emerson, "Watch who you are speaking to. You might read about it" (C. St. ¶ 44).

     6.       Grochowski commented that he could assign Emerson wherever he wanted (E. Mem. 3).

     7.       Zurella refused her request to back her up so that she could let inmates out of their cell, and he allegedly said, "We're sick of you, you and your To/Froms" and "You don't want to work under this supervisor, bid out " (E. Mem. 3-4).

     8.       When Emerson wrote in a To/From "this Shift Commander has stated to R/O his feelings as it relates to her at work either to myself or other supervisors and therefore, I am not safe[,]" Grochowski responded that Emerson was suffering from paranoid delusions and requested that she be sent for a fitness for duty evaluation regarding her mental state (id. 4).

## **Legal Standard**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). And though summary judgment standards require courts to view all facts in a light most favorable to the nonmovant, "[a] party

seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it'" (Caisse Nationale de Credit Agricole v. CBI Indus., Inc., 90 F.3d 1264, 1270 (7th Cir. 1996)).  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Title VII Retaliation Claim

Section 2000e-3 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  To prove a Title VII retaliation claim, a plaintiff must present evidence that she engaged in a statutorily protected activity, that she suffered an adverse action and that there is a but-for causal connection between the two (Lord v. High Voltage Software, Inc., 839 F.3d 556, 563 (7th Cir. 2016)).  Once a plaintiff has made a prima facie case for retaliation, the employer can defeat it by producing evidence of a non-retaliatory motive for the adverse employment action, unless the plaintiff can show that the alleged non-retaliatory motive was pretextual (Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 642-43 (7th Cir. 2002)).

Statutorily Protected Activity

As to the required element of "statutorily protected activity," a plaintiff need not show that the complained-of conduct was in fact unlawful, but must instead demonstrate that she had a sincere and objectively reasonable belief that she was opposing an unlawful employment practice (Lord, 839 F.3d at 563).  Once a plaintiff has made a prima facie case for retaliation, the employer can defeat it by producing evidence of a non-retaliatory motive for the adverse employment action, unless the plaintiff can show that the alleged non-retaliatory motive was pretextual (Stone v City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 642-43 (7th Cir. 2002)).

In that respect Section 2000e-2 prohibits employment discrimination on the basis of one's "race, color, religion, sex, or national origin." Thus complaining about race- or sex-based discrimination in the workplace can be a statutorily protected activity under Title VII, but the plaintiff's complaints must also be objectively reasonable (Lord, id.).

As a threshold matter it appears that only Emerson's 2009 charge is statutorily protected. First she admits that her 2012 OPR complaint did not claim that she was discriminated against because of her race or sex (E. Resp. St. ¶ 24), and none of the To/From memos that she produced make claims of discrimination (see E. Dep. Ex. B). Only her 2009 charge complained of race and sex discrimination, and County Defendants do not argue that it was objectively unreasonable. For purposes of this opinion, then, this Court will assume that the 2009 charge was a statutorily protected activity. Given that, Emerson must establish that she suffered a materially adverse employment action in retaliation for having filed the 2009 charge.

Materially Adverse Employment Action

Emerson describes a series of negative interactions with two of her superiors, Grochowski and Zurella, and asserts that their actions constitute materially adverse employment actions. In addition she contends that Grochowski refused to give her certain preferred assignments and that on three occasions he assigned her to work in close proximity to Heilemann, who was the subject of her 2009 charge.

Dass v. Chicago Bd. of Educ., 675 F.3d 1060, 1069 (7th Cir. 2012), quoting Nichols v. S. Illinois Univ.-Edwardsville, 510 F.3d 772, 780 (7th Cir. 2007), has articulated three general categories of materially adverse employment actions that are actionable under Title VII:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces

> the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

As to the second of those categories O'Neal v. City of Chicago, 392 F.3d 909, 911-12 (7th Cir. 2004) (internal citation and quotation marks omitted) has cautioned that "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance," does not qualify as materially adverse, and "[a] transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either."

In that regard, for example, Dass, 675 F.3d at 1070 held that assigning a teacher to seventh grade instead of her preferred third grade did not materially alter the terms and conditions of her employment, despite the fact that the teacher would confront different behavioral problems in seventh grade. Likewise O'Neal, 392 F.3d at 912-13 sided with defendants in a case where the plaintiff police officer had been transferred from the specialized Narcotics Unit to the position of beat sergeant, rejecting the plaintiff's argument that the move lessened her chances of promotion and marred her reputation.

In the light of such precedents it would defy logic to hold that changing a corrections officer's temporary assignment from sanitation to a residential tier -- something that the officer has admitted is likely to happen in the course of regular rotation anyway -- constitutes a materially adverse employment action. And although Emerson informed her union that the sanitation and powerwash assignment had helped her manage her stress and anxiety, she makes no claim that she was somehow legally entitled to that assignment. What Emerson is left with, then, is a case of "purely subjective preference for one position over another[,]" which

Herrnreiter v. Chicago Hous. Auth., 315 F.3d 742, 745 (7th Cir. 2002) has explained "do[es] not justify trundling out the heavy artillery of federal antidiscrimination law . . . ."

Emerson also complains that Grochowski refused to assign her to security and roster management, consistently choosing to assign three other women. But she makes no showing that denying her those positions was an actionable offense. In her response to County Defendants' Statement of Material Facts she points out that all the officers to whom Grochowski gives those assignments are "non-Black," and in her Affidavit she alludes to her belief that his actions are discriminatory (E. Aff. ¶ 4)

> Security and roster management are not particular skills of officers, including Cahue, Caldemon and Vargas, all of whom are female and white or white/Hispanic. I have the same skills and officer training . . . and could have learned the particular tasks and procedures.

But to succeed on a Section 2000e-2 discrimination case, Emerson must also be able to prove that she has suffered an adverse employment action (Andrews v. CBOCS West, Inc., 734 F.3d 230, 234-35 (7th Cir. 2014). And as already discussed, refusing to afford someone her preferred assignment does not amount to a materially adverse employment action.

So Emerson has failed to pass muster on the second of the three Dass-identified categories (and the first is plainly inapplicable to her case). That leaves the third for consideration -- one under which she must offer evidence that her treatment at the hands of Grochowski and Zurella meets this test (Dass, 675 F.3d at 1069):

> the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

On that score Herrnreiter, 315 F.3d at 744 has spoken of the "classic case being that of the employee whose desk is moved into a closet." But the adverse conditions category also

includes "cases of constructive discharge: the employer has made the job unbearable for the employee" and "cases of harassment -- mistreatment of an employee by coworkers or supervisors that is sufficiently severe to worsen substantially his conditions of employment as they would be perceived by a reasonable person in the position of the employee" (Herrnreiter, id.). In cases of workplace harassment the Supreme Court sides with plaintiffs as to behavior that is "so severe or pervasive that it created a working environment abusive to employees because of their race, gender, religion, or national origin" (Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)), and our Court of Appeals has noted that "[t]he workplace that is actionable is one that is 'hellish'" (Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997), quoting Baskersville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995)).

By contrast, the Supreme Court has explained that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted), while our Court of Appeals has explained that "Title VII protects against discrimination, not personal animosity or juvenile behavior" (Brown v. Advocate S. Suburban Hosp., 700 F.3d 1101, 1105 (7th Cir. 2012) (internal quotation marks omitted)), nor does it protect against behavior by supervisors that is "rude, abrupt, and arrogant" or "boorish" (Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 339 (7th Cir. 2002)). For instance, refusing to greet an employee or acting "standoffish, unfriendly, and unapproachable" will not subject an employer to liability under Title VII (McKenzie v. Milwaukee County, 381 F.3d 619, 625 (7th Cir. 2004) (internal quotation marks omitted)).

By any reasonably objective measure the incidents about which Emerson complains clearly do not fall to the level of "a humiliating, degrading, unsafe, unhealthful, or otherwise

- 9 -

significantly negative alteration in her workplace environment" (Dass, 675 F.3d at 1069). First she alleges that Grochowski ignored her during roll call, and then when he did speak to her he said "Oh, well, I don't know what you're going to do today; I haven't decided," and that he told her "I can do what I want with you." (C. St. ¶¶ 39, 45). Emerson also contends that when she complained Grochowski answered "I've been here this long. What are they going to do to me? Keep complaining if you want. Nothing is going to happen to me" (E. Mem. 5). And in response to one incident report Grochowski stated that Emerson was having paranoid delusions and requested that she be evaluated for fitness for duty, but there is nothing in the record to suggest that any further action was taken.

For his part, Zurella refused to assist Emerson when she let her inmates out of their cells, saying that her partner should do that instead. In the same exchange he mentioned that everyone was sick of her multiple To/Froms and suggested that she should "bid out" if she was not happy with her supervisor. As a result, Emerson noted in the tiers' daily log that she did not let inmates out of their cells that day because she felt unsafe doing so (C. St. ¶ 51). Finally, Emerson contends that on three days Grochowski assigned her to work near Heilemann, someone who in part prompted her 2009 charge of race discrimination by yelling at her "ignorant bitch, do your fucking job" (C. St. ¶ 41; E. Aff. ¶ 8). But Emerson mentions no interactions that occurred between herself and Heilemann after she filed her charge, nor -- and perhaps most importantly where claimed retaliation is in issue -- does Emerson offer any evidence that Grochowski knew that she had filed a charge against Heilemann and purposely subjected her to working near him.

None of the incidents described here, either singly or collectively, add up to more than rude and inconsiderate behavior that, as our caselaw has explained at length, this Court is in no position to police. What Emerson claims to have experienced was not "sufficiently severe to

worsen substantially [her] conditions of employment as they would be perceived by a reasonable person in the position of the employee" (Herrnreiter, 315 F.3d at 745). Though Emerson found those things distressing, Grochowski's "standoffish, unfriendly, and unapproachable" demeanor and his decision on three occasions to assign Emerson near Heilemann, and Zurella's isolated comments and refusal to help would not, for any reasonable person in Emerson's position, amount to substantially worsening employment conditions. And while Emerson may indeed feel that her work environment is uncivilized, it has been clearly established that Title VII is not a "general civility code" (Faragher, 524 U.S. at 788, quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

Causation

Although it suffices to show that Emerson has accumulated two strikes on the elements of proof required for the second category of "materially adverse employment actions" (a sort of litigation game in which even one strike is "out"), she also manages to fail on the third as well: the need to show a but-for causal connection between the purported (but unproved) materially adverse employment action and her only statutorily protected activity, the 2009 charge. First, although this is not dispositive, that charge did not mention Grochowski or Zurella, the people named in this lawsuit. Courts may draw an inference of knowledge "when an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct" (Lord, 839 F.3d at 564) (internal quotation marks omitted)). But in this case many of the matters that Emerson describes occurred nearly three years after the 2009 charge -- indeed, Zurella was not even a Sergeant in Division 9 until 2011. Importantly, there is no evidence that either officer even knew about her charge (C. St. ¶ 22). Instead both of them groused only about Emerson's

numerous To/Froms, many of which were filed in 2012 and are not statutorily protected. Zurella specifically mentioned her To/Froms in their exchange. And when Grochowski said that Emerson was having "paranoid delusions" and when he told another officer who was talking to Emerson to "Watch who you are speaking to. You might read about it," it is plain that he too was referring to her frequent To/Froms.

Furthermore, as to actions that actually affected Emerson's assignments, County Defendants persuasively point to non-retaliatory motives that Emerson cannot plausibly label as pretextual. At the risk of unduly lengthening the discussion of a claim that Emerson has already lost, this opinion goes on to provide examples.

For instance, on the day that Zurella and Emerson had words, he refused to back up Emerson because her partner officer on the tier -- not the sergeant -- was supposed to do so (C. Mem. 10). As for Grochowski, he assigned Emerson to a tier instead of to her preferred sanitation work because there were not enough officers on those days to staff all the tiers, which meant someone had to be reassigned from a nonessential sanitation job (C. Mem. 9-10). And on days when Grochowski said during roll call, "I don't know where I'm going to put you," he actually did not know because his staff numbers for the day had not been finalized -- if all the tiers were covered he could put Emerson on sanitation, but if not he would have to assign her to a tier (id.). On another subject, County Defendants explain that Emerson did not receive the administrative assignments that she preferred because she did not have the requisite training (C. Mem. 9). Although Emerson requested the training, there is nothing to indicate that the failure to accede to that request was discriminatingly motivated or the County Defendants were under some federal legal obligation to provide such training and in turn provide Emerson with her desired assignment. Finally, Grochowski commented on Emerson's mental state in response

to one of her To/Froms because Lieutenants are required to provide an assessment of officers when they file incident reports. Grochowki's assessment was based on a state certification course in psychology that was meant to enable him to make recommendations that officers receive a psychiatric evaluation (C. Mem. 11). Although Emerson claims that Grochowski's purpose was to insult her, her accusation certainly does not demonstrate that Grochowski's stated motives were a pretext for discrimination (E. Resp. C. St. ¶ 56).

### **First Amendment Retaliation Claim**

To turn now to Emerson's claim of First Amendment retaliation actionable under 42 U.S.C. § 1983, a plaintiff must provide a prima facie showing that her speech was constitutionally protected, that she suffered a deprivation likely to deter free speech and that her speech was at least a motivating factor in the employer's action (Massey v. Johnson, 457 F.3d 711, 716 (7th Cir. 2006)). And here too Emerson comes up short.

For a public employee's speech to be constitutionally protected under the First Amendment, the employee must speak as a citizen on a matter of public concern (Kubiak v. City of Chicago, 810 F.3d 476, 481 (7th Cir. 2016). First it is clear here that Emerson's speech was not thus protected because she spoke as an employee, not qua citizen, and that she did not speak on a matter of public concern. Kubiak, 810 F.3d at 481-82 makes it plain that public employees' complaints of harassment are made as such employees, not as private citizens. Second, Emerson's speech concerned only her own problems at work -- they were made with the clear intention of improving her working conditions and did not relate to the general public in any way. As Gross v. Town of Cicero, 619 F.3d 697, 706 (7th Cir. 2010) states, "[p]urely personal grievances do not garner First Amendment protection" -- and that surely includes personal grievances about harassment in the workplace.

Because Emerson has failed to satisfy the first element of a First Amendment retaliation claim, there is no need for further analysis. County Defendants' motion for summary judgment on Emerson's First Amendment retaliation claim is also granted.

## Conclusion

For the reasons stated at length in this opinion, County Defendants' motion for summary judgment is granted in its entirety. This action is dismissed with prejudice.

_____
Milton I. Shadur
Senior United States District Judge

Date: May 17, 2017